THE STATE OF FLORIDA, APPELLANT, VS. THE BLACK RIVER PHOSPHATE COMPANY, APPELLEE.

1. A bill in equity stating that a certain stream within this state is in fact navigable for the purposes of public commerce, without any direct averment that the state is the owner of the bed of such stream or of the deposits therein, does not allege the title or right of the state with such sufficient certainty as would warrant the granting of an injunction, therein prayed, to restrain the removal of phosphatic or other deposits therefrom; or to require an answer to such bill. A demurrer to such bill is properly sustained on the ground of insufficiency, uncertainty and vagueness.

2. The state, in the absence of any prior or better right, is the owner of the entire beds of all streams within her borders that are in fact navigable by the public in the conduct of useful commerce thereon, whether the waters of such stream be salt or fresh; or whether the tides of the sea ebb and flow therein or not.

Appeal from the Circuit Court for Clay county.

The facts of the case are stated in the opinion.

*W. B. Lamar* and *A. W. Cockrell & Son* for Appellant.

The contention of the appellee below was that by the common law the doctrine was settled "a grant of land to a subject or citizen, bounded on a fresh water stream or river where the tide neither ebbs or flows, extends

to the middle of the channel of the river." The case of Hooker vs. Cummings, 20 Johns., 91, approving what Kent, C. J., said in 1805 in Palmer vs. Mulligan, 3 Caines, 319, was relied upon.

The further contention was that the Territorial Legislature of Florida, by the unqualified adoption of the common law, November 6, 1829, produced, by implication, or recognized as already existing, the rights of riparian proprietors, extended "*ad filium aquae,*" of all fresh water streams, non-tidal, whether navigable or not.

It will be observed the act of November 6, 1829, in terms excepts from its operation so much of the common law as is "inconsistent with the Constitution and laws of the United States and the acts of the Legislative Council of this Territory."

The act of Congress of 1803, " Regulating the grants of lands, and providing for the disposal of the lands of the United States south of the State of Tennessee," declares that ·'all navigable rivers, within the Territory of the United States south of the State of Tennessee, shall be deemed to be and remain public highways."

The Territories of East and West Florida were acquired by treaty concluded February 22, 1819, sixteen years after the act of Congress of 1803 ; but not until the act approved March 3, 1821, was the President au-

thorized to take possession of these Territories ; and shortly thereafter, May 8, 1822, Congress passed "An the act for ascertaining claims and titles to lands within Territory of Florida." But such was the solicitation of Congress, on the subject of its navigable waters, that notwithstanding the act of 1803, it passed "An act amending, and supplementary to the 'act for ascertaining claims and titles to land in the Territory of Florida,' and to provide for the survey and disposal of the public lands in Florida," by the 12th section of which it was ordained :

"SEC. 12. That all the navigable rivers and waters in the Districts of East and West Florida shall be, and forever remain, public highways."

Bearing in mind this section is found in an act of Congress, amending and supplementing an act, passed the year before, "for *ascertaining claims and titles to lands*," its significance becomes apparent.

Developing the further legislative history of the subject, it appears the rights of sovereignty over the navigable waters of the Territory have been upheld with strong hand and constantly asserted. In 1828, by the act approved November 22, 1828, the Territorial Council, in section 119, provides penalties for obstructing "any navigable water course" whereby "the passage of fish," or "the navigation of boats drawing three feet of water" may be obstructed ; and in section 120,

of the same act, provided a penalty for felling trees "into any navigable stream within this Territory" so as to obstruct the navigation thereof. This act of 1828 was substantially re-enacted in 1832, act approved February 10, 1832, sections 72 and 73. Acts specifically declaring streams therein severally named navigable were passed, extending in point of time from October 27, 1828, McClellan's Digest, 969, through the territorial existence, and down to 1889, when Anclote river was declared navigable, Ch. 3941. See also Ch. 3931. Other acts granting ferry or bridge privileges over non-tidal navigable waters, cover the entire legislative period of the Territory and State.

This legislation, Congressional, Territorial and State, is wholly at war with the proposition that, by the adoption of the common law, the rights of riparian proprietors of fresh water streams in this State were extended to, or recognized as extending to, the thread of navigable non-tidal streams.

The case of Hooker vs. Cummings, 20 Johns., 91, was in terms repudiated long ago, in 1835, by the Supreme Court of Alabama, in Bullock vs. Wilson, 2 Porter, 436, in the following language:

"It is very obvious, however, that, with us, the question does not depend on the tide, or *fresh water;* that if the river has been expressly recognized as a public highway by the Federal and State Governments;

or even if it be of sufficient width and depth, and suited to the ordinary purposes of navigation, and the government has not expressly granted any part of the bed, or computed it in the quantity granted, which implies an exception, as in case of navigable water, the stream is thereby constituted a public highway, and no individual can assert any private right of soil in the bed beyond the low water mark. His claim could have no better foundation than that in the case of the *oyster bed* planted in the tide water, both places being alike reserved for public use."

In 1851, twenty-six years after this Alabama decision, the Supreme Court of the United States, in Genesee Chief vs. Fitzhugh, 12 How., 443, declared that the line of separation between public and private rivers, the navigable and non-navigable, in this country, could not be drawn, as in England, on the test of the ebb and flow of the tide. Taney, C. J., *then* declared, as Chief-Justice Saffold had declared in Bullock vs. Wilson, that the *accidental* coincidence in England of tide-water and navigable water, had led under the natural influence of precedents and established forms to the *substitution* of what was *there* a proper *description* of a public navigable river in the place of the *thing* intended to be described. And Chief-Justice Taney further argues, "if there were no waters in the United States which are public, as contradistinguished from private, except where there is tide," tide-water and

navigable water might have been perpetuated here as synonymous terms. And it was under the influence of the fact that navigable waters and tide-waters were not synonymous, that the precedents of a quarter of a century were set aside; and it was solemnly adjudged, " it is evident that a definition that would at this day limit public rivers in this country to tide-water rivers, is utterly inadmissible."

The decision of the United States Supreme Court in the Genessee case was in terms affirmed in Fritz vs. Bull, 12 How., 466; Steamboat Magnolia, 20 How., 298. In the case of the Hine vs. Trevor, 4 Wall, 555, Judge Miller pronouncing the unanimous opinion of the court, declared that Chief-Justice Taney, in the Genessee case, had "demonstrated" that the *tidal test* of the navigability of the waters of · England had been substituted as the rule, instead of the navigability itself.

The decision in the Genessee case was adhered to in "The Eagle," 8 Wall., 15, and the principles therein announced applied so vigorously as to render inoperative and ineffectual as a grant of jurisdiction the so-called enabling act of 1845, which was passed by Congress on the assumption, declared in the Genessee case to be a false one, that navigable waters and tidal waters were synonymous, in the sense in which the grant of admiralty jurisdiction in the Constitution of the United States was to be construed.

Judge Bradley in Insurance Company vs. Dunham, 11 Wall., 26, repeats and re-affirms the declaration of Chief Justice Taney in the Genessee case "that a definition which would at this day limit public rivers in this country to tide water rivers is utterly inadmissible;" and further declares "the point must be considered as no longer open in this court."

Again in the case of "The Montello," 20 Wall., 430; the Supreme Court speaking through Judge Davis declared "the navigability of a stream for the purpose of bringing it within the terms "navigable waters of the United States," does not depend upon the mode by which commerce is conducted upon it, as whether by steamers, or sailing vessels or Durham boats, nor upon the difficulties attending navigation even though these be so great as to prevent the use of the best means, such as steamboats, for carrying commerce. It depends upon the fact whether the river in its natural state is such that it affords a channel for useful commerce."

Justice Blatchford in 1883, speaking for the Supreme Court, in *Ex parte* Boyer, 109 U. S., 629, declared the Illinois and Michigan Canal, an artificial water way, connecting Lake Michigan with the Mississippi River, a "public water of the United States."

Nor is there a substantial basis for controversy as to the decisions of the U. S. Supreme Court, defining the nature and extent of the rights of riparian owners of

lands lying upon navigable waters of the United States.

The shores of navigable waters, and the soil under them, were not granted to the United States by the Constitution, but were reserved to the states; and new states have the same rights, sovereignty and jurisdiction over the subject that the original states have. Pollard vs. Hagan, 3 How., 212; Goodtile vs. Kibble, 9 How., 471; Doe vs. Beebe, 13 How., 25; Withers vs. Buckley, 20 How., 84.

In Martin vs. Waddell, 16 Peters 367, the court speaking through Chief Justice Taney, uses this language:

"We do not propose to meddle with the point which was very much discussed at the bar, as to the power of the King since Magna Charta to grant to a subject a portion of the soil covered by the navigable waters of the kingdom, so as to give him an immediate and exclusive right of fishery either for shell-fish or floating fish within the limits of his grant. The question is not free from doubt, and the authorities referred to in the English books cannot perhaps be altogether reconciled. But from the opinions expressed by the justices of the court of king's bench, in the case of Blundell vs. Catterall, 5 Barn. & Ald., 287, 294, 304, 309; and in the case of the Duke of Somerset vs. Fogwell, 5 Barn & Cress., 883, 884, the question must be regarded as settled in England against the right of the

king since Magna Charter to make such a grant. The point does not, however, arise in this case unless it shall first be decided that in the grant to the Duke of York, the king intended to sever the bottoms of the navigable waters from the prerogative powers of government conferred by the same charter; and to convert them into mere franchises in the hands of a subject, to be held and used as his private property. And we the more willingly forbear to express an opinion on this subject, because it has ceased to be a matter of much interest in the United States. For when the revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the constitution to the general government.

This language as to the holding by the several states, in their character as sovereign, of absolute title to "all their navigable waters and the soil under them," is repeated in Gilman vs. Philadelphia, 3 Wall., 726. In Barney vs. Keokuk, 94 U. S., 338, Justice Bradley speaking the opinion of the U. S. Supreme Court, said:

"The confusion of navigable with tidal water, found in the monuments of the common law, long prevailed in this country, notwithstanding the broad differences existing between the extent and topography of the

British Island and that of the American continent. It had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and under the like influence it laid the foundation in many states of doctrines with regard to the ownership of the soil in navigable waters above tide-water at variances with sound principles of public policy, whether, as rules of property, it would now be safe to change these doctrines where they have been applied, as before remarked, is for the several states themselves to determine. If they choose to resign to the riparian proprietor rights which properly belong to them in their soverign capacity, it is not for others to raise objections. In our view of the subject the correct principles were laid down in Martin vs. Waddell, 16 Pet., 367; Pollard's Lessee vs. Hagan, 3 How., 212, and Goodtitle vs. Kibbe, 9 id., 471. These cases related to tide-water, it is true; but they enunciate principles which are equally applicable to all navigable waters. And since this court, in the case of the Genessee Chief, 12 id., 443, has declared that the Great Lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters, and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the state by their inherent sovereignty, and the United States has wisely abstained from extending (if

it could extend) its survey and grants beyond the limits of high water. The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the states in which the lands were situated. In Iowa, as before stated, the more correct rule seems to have been adopted after a most elaborate investigation of the subject.''

Under the influence of the Federal decisions States which hitherto recognized the rights of riparian proprietors as embracing the soil of navigable rivers extended to the middle of a navigable stream have receded from that position. Benson vs. Morrow, 61 Mo., 345 ; Wisconsin River Co. vs. Lyons, 30 Wis., 61.

And there can nowhere be found a decision better supported by reason and authority than the able and instructive and unanimous opinion and decision that is presented in People vs. Canal Appraisers, 33 N. Y., 431.

In St. Louis, I. M. & S. Ry. vs. Ramsey *et al.*, decided by the Supreme Court of Arkansas, May 24, 1890, 13 S. W., 931 ; S. C., 53 Ark. Rep., page 314 ; the conclusion arrived at is set forth in the first head note as follows :

'' The owner of land on the margin of a navigable stream, holding under a grant from the United States, does not take to the middle of the stream, but to high-water mark, which is determined by the change in the

vegetation and the character of the soil, and the beds of all navigable streams, though the tide does not ebb and flow in them, belong to the State."

The court below, in the case at bar, as will be seen in its opinion, sustained the demurrer of the defendant, and yet declined to decide whether the phosphates beneath the water in the channel of the river, as distinguished from the phosphates in the margin covered by the water outside the channel, belonged to the State.

The bill alleged, and the demurrer admitted, "your orator is not advised of the proportion of said rock and deposit which said defendant has been and is taking from the bed of said river underlying the waters embraced between the ordinary water mark on either side of said river, as distinguished from that taken from the bed underlying the channel thereof; but your orator avers that said defendant has been and is trespassing upon, digging, mining, removing and appropriating said rock and deposit wrongfully and indiscriminately from the entire bed covered by the water of said river at its ordinary volume."

Under this view, therefore, the sustaining of the demurrer is indefensible, if the State owns the phosphatic rock in any part of the bed of the river.

We insist the State owns the soil, and the phosphate deposits, in the bed of the stream lying between the high-water marks on either side; that high-water mark

as the line between the riparian proprietor and the public is to be regarded as co-ordinate with the limit of the river bed ; that what the river does not occupy long enough to wrest from vegetation, so far as to destroy its value for agriculture is not river bed.

It nowhere appears in the pleading that the defendant is the owner or claims to be the owner, by or under a grant from the United States, or the State, of the land on the margin of the river opposite the point from which the phosphate is being extracted, or elsewhere, or is *otherwise* a riparian proprietor or holder.

As it does not appear that the defendant was a riparian proprietor, on the 27th day of December, 1856, or that it holds under such a riparian proprietor, it is obvious the State *has* now, so far as the pleadings show all the title it had when it became a sovereign State, by virtue of its sovereignty ; all the title it had when the act entitled " An act to benefit commerce" was passed.

Now what is the effect of this act ? The State by this act did not divest or seek to divest itself of other submerged lands than such as were "lying in front of any tract of land *owned* by a citizen of the United States, or by the United States." The act is a legislative declaration that at *that* time the State was the proprietor of all submerged lands within its boundaries lying upon navigable streams ; and this full pro-

prietorship, in any possible view, exists in the State to this day, unless and except it was divested, and *only* to the *extent* divested, by the operation of this act. It is ovious, therefore, that one claiming an interest in lands by the operation of this act must bring himself within its terms by showing that himself or vendor, immediate or remote, was on the 27th day of December, 1856, the owner of the lands, *on a navigable stream*, in front of which the submerged lands claimed lie.

The opinion of the court, sustaining the demurrer, proceeds upon these several postulates :

1. That Black River, at the point from which phosphates are being taken, is a navigable stream within the purview of the act of 1856 ;

2. That the defendant is a riparian proprietor, at this point, holding by virtue of a grant, bounded by the river, executed to it, on or before December 27th, 1856; or that the defendant holds title to this submerged soil, acquired since that date, immediately or remotely, from such a riparian proprietor ;

3. That the State, by virtue of its sovereignty, on the 27th day of December, 1856, owned in full proprietorship all the submerged lands, affected by the act ;

4. That the act operated as a legislative grant to the riparian proprietor of the absolute fee to the submerged lands, covered by its terms, investing them

290      SUPREME COURT.

The State of Florida v. Black River P. Co.—Argument of Counsel.

with the right to extract, and remove therefrom, the phosphate in the soil thereof, for *private* emolument.

We deny as a matter of fact the second proposition; and as matter of law the fourth proposition.

Let us examine the fourth proposition.

"In applying rules for interpreting statutes to questions on the effect of an enactment, we can never safely lose sight of the subject. That must be the truest exposition of a law which best harmonizes with its design, its object and its general structure. Dwarris on Statutes, 556, citing Vattel, quoted and approved in Jones *et al*. vs. Dexter, Adm'r, 8 Fla., 285.

The act is entitled "An act to benefit commerce," and its preamble is:

"Whereas, it is for the benefit of commerce that wharves be built and warehouses erected for facilitating the landing and storage of goods; and whereas, the State being the proprietor of all submerged lands and water privileges, within its boundaries, which prevents the riparian owners from improving their water lots; therefore,

"SECTION 1. Be it enacted * * *, That the State of Florida for the considerations above mentioned, divest themselves of all right, title and interest to all lands covered by water, lying in front of any tract of land owned by a citizen of the United States, or by the United States, for public purposes."

It is obvious the qualification, "for public purposes," limits and explains the extent to which the State was to be *thereby* divested of its property in *such* submerged land. This act of divestment by the State is the *only* subject in the clause, of which this qualification is predicable, unless indeed it is predicable of the "land owned:" but it would be absurd to limit the grant by the State to such class of riparian ownership, if there be such a class, as was theretofore held by individuals, "for public purposes." The State then divested itself of such submerged lands, not absolutely, but only for "public purposes."

Had it been the purpose of the Legislature to pass the absolute fee simple title, for *private* as well as *public* purposes to riparian owners, this would have been accomplished, so far as the State *could* pass such a title, by enacting the first nine lines, down to and including the "riparian proprietors," omitting the qualification, "for public purpose," in the sixth line, and eliminating the balance of the section. The construction put by the court on this section gives effect to it, precisely as if the words "for public purposes," in the sixth line, and all after the word "proprietors," in the ninth line, were absent from the section.

The section cannot be thus emasculated by the court; nor can the legislative purpose or meaning be drawn from it as thus emasculated. There is no rule of construction, as applied to the most favored class of stat-

utes, which permits a court to ignore any part of its context in arriving at the real meaning of the Legislature in passing a statute.

We by no means concede that the State could thus gratuitously pass to riparian land-owners, or others, the proprietorship in lands covered by the waters of its navigable streams, theretofore acquired by the State by virtue of its sovereignty *as such*, and held by the State in trust to be administered for the benefit of all the people of the State, in the exercise of its jurisdiction as a sovereign. We refer to the case of Martin vs. Waddell, 16 Pet., 367, and especially to the extract from Chief Justice Taney's opinion therein hereinbefore quoted; also to Atlee vs. Packet Company, 21 Wall., 395; to show the State has no such right. Goodwin vs. Thompson, 15 Lea, 209; S. C. 54, A. R., 410.

However this may be, it is clear, this statute operating as a grant is to be construed strictly. The sovereign will not be presumed to intend to part with the dominion and property in navigable waters, and in the lands under them, thus entrusted to its care for the benefit and advantage of the whole community, "unless clear and especial words are used to denote it."

"All acts in "*pari materia* should be taken together, as if they were one law." Mitchell vs. Duncan, 7 Fla., 13; Spencer vs. McBride, 14 Fla., 403. And

this, even though they contain no reference to each other.   Forrari vs. Board of Health, 24 Fla., 390.

The act of December 27, 1856, concerned exclusively lands covered by the navigable streams and waters of this State.   The act of June 7, 1887, p. 280, is upon the same subject, and as did the former act, operates as a qualified grant in respect to such lands.

The act of 1856 proceeded upon the hypothesis that all such submerged lands were the property of the State, and made certain well defined concessions to riparian proprietors, in reference to such lands.

The act of 1887 proceeds upon the hypothesis that the right to dig and mine and remove phosphate from the beds of navigable streams and waters is *still* in the State ; and exacts for the State "one dollar per ton for every ton of phosphate rock and phosphatic deposits dug, mined and removed from the said navigable rivers and waters of this State." A clearer legislative declaration asserting the absolute ownership of the State to every ton of phosphate rock, and phosphatic deposits dug, mined and removed from the *beds* of navigable streams and waters of the State can scarcely be conceived.

Nor do the decisions of the Florida Supreme Court upon this act of 1856, in the slightest degree, as we understand them, even trend in the direction of the conclusion of the court below as to the 4th proposition we are discussing.

The case of Rivas & Koopman vs. Solary, 18 Fla.; 122; declares that the riparian proprietor holds the right or title passed to him by this act of 1856 subject to the conditions therein prescribed. The case of Sullivan vs. Moreno, 19 Fla., 120, is more emphatic; it declares that while the power of passage upon or navigation of such waters may be destroyed by filling the space before that time occupied by water, with material necessary or proper to be used in the construction of the structures *beneficial* to *commerce;* yet all this is, however, subject to the consideration that the wharf constructed or the deposit made is to be for the benefit of commerce. And in the case of Ruge vs. Apalachicola O. C. & F. Co., 6 So. Rep., 492, this court uses this significant language: "If Water Street, as I think is shown, ran between the promenade and the bay, the riparian right attached to that; but if the promenade went to the shore there may be a question whether the act vests any right to the water front as a public park. The use of it for such a purpose is not within the contemplation of the act; and either the State holds it, or, if it goes to the promenade, it goes divested of the character of a park, and if used at all, must be used for the "benefit of commerce," in the erection of wharves, warehouses and other buildings. So there seems to be nothing in the act to aid the cause of complainant."

As to construction of grants, see Commonwealth vs. Roxbury, 9 Gray, 492; Packer vs. Bird, 11 Sup. Court Rep., 210—opinion by Judge Field.

*II. Bisbee* and *Cooper & Cooper* for Appellee.

### BRIEF FOR APPELLEE OF COOPER & COOPER.

We submit that the allegations of this bill are entirely too indefinite, vague and uncertain to be grounds of any discovery or relief, or to enable defendant properly to answer or make its defences. It does not state what the claim of defendant is nor what title of complainant is alleged to be, nor in fact that it has any title. That complainant claims to have any right in the premises at all can be gathered, if at all, only by inference.

There is a loose allegation in paragraph 2 as to phosphate being taken from the bed of the river "about one mile below Middleburg," and still looser allegations apparently intended to show navigability of stream, "at this point and above and below it," and the prayer for relief seems to be as to the entire stream from its source to its mouth. We are not informed what the claim of the State is, nor that it owns any phosphate, lands or creek beds, but if we are to guess that it does claim bed of stream, or to own phosphate deposits, there must be some description, reasonably accurate and certain designation, description and limitation of the *locus in quo* as to trespass upon which, committed or threatened, relief is sought. The State must show title, and the defendant, to be enabled to answer or defend, must be so advised by the bill as to location concerning which suit is brought as to be able to set forth his title by deed, license,

grant or ownership of the abutting riparian lands, to the particular submerged lands or portion of bed of stream concerning which suit is brought. We are not told by the bill how far "above and below" the unlocated point "about one mile below Middleburg," the conditions supposed to show navigability of stream extend, nor is it alleged that defendant is taking or threatened to take phosphate either "above or below" where it is now dredging, yet as far as can be gathered from the prayers, which are as loose and uncertain as the stating parts of bill, relief is prayed as to the whole stream from its source to its mouth. We submit that this bill obviously does not comply with the rules of equity pleading as to certainty.

Nor does the bill anywhere state what the claim of complainant is, nor that complainant has any title to the premises or subject matter of suit.

As to requirements of equity pleading in these matters, see Story's Eq. Plead., secs. 242, 244 to 252; also 508, a; Sullivan vs. Moreno, 19 Fla., 200.

The State of Florida is not the general source of title to lands in her limits, but the original sources of title are Spain and the United States. The State is not even the general owner of lands under tide waters between the banks or shores and the channels, but has granted away by general statutes such lands generally, and if in a particular case, by reason of a particular exception, the State owns a particular piece of submerged land, the title should be set out in its

pleadings.   Doe ex dem., Magruder vs. Roe, 13 Fla., 602, 614.

In the 4th paragraph there is a confused statement or reference as to the digging of phosphate from bed of stream under and not under channel, but whether the claim, title or interest of complainant is to all the land under the stream, or only to that under channel is not stated.   This we are entitled to have specifically stated to enable us properly to plead to the bill.

Even in a navigable tide-water stream, in Florida, the State does not own the submerged land outside of the channel, unless it be in exceptional cases where the act of 1856 does not apply but such emerged lands, having been by statute of general application granted to the riparian owners fronting on the water, if the State claims to own such submerged lands outside of the channel, it must set out the facts which give it title, showing that the act of 1856 does not apply, or that the State is the riparian owner, as the title to all the submerged land between the channel and the bank, by the general law of the State, belongs to the riparian owner—to the owner of the high land bounding on the water—it is necessary for the bill, if it claims such submerged lands, to show the ownership of the adjacent high lands in complaint, or, if the title to such submerged lands is not attached to the high lands, the bill should show the facts as to the particular land which causes such separation.

The act (Chapter 790) grants to the owners of lands lying on navigable waters the submerged lands lying

in front of the lands of such owners, was approved December 27, 1856. It is one of the great sources and muniments of title in this State, and in the long period during which it has been in force, by long standing judicial decisions, by the general opinion of the legal profession, by the general understanding and acceptance of the people, and of the State government, and the dealings with, transfers of and improvements on such submerged lands during all these years, this act has become so large a portion of the law of real property in this State, that any attempt at this day to repudiate, impair or construe away its grants is sufficient to excite grave apprehensions, and if such an attempt should be in any degree successful, the injury to the State and its people would be very serious, not alone in the pecuniary injury done the large numbers of individuals directly interested in such lands, but in the insecurity, and the sense of insecurity of all titles and property rights if long standing laws and decisions may be abrogated or the interpretation altered, with each change of opinion as to expediency or public policy, or with each change in the fluctuating opinions of individual judges.

The questions now attempted to be raised as to this act, but which have been long since settled as aforesaid, are the following: Is the act effectual for any purpose, and did it grant anything? If it is effectual, and did contain a grant, what did it grant and to whom?

The statute was first construed by this court in 1859,

JANUARY TERM, 1891.    299

The State of Florida v. Black River P. Co.—Argument of Counsel.

in the case of Geiger vs. Filor, 8 Fla., 325, and in that decision, contemporaneous with the act, all these questions are answered. After quoting the act in full, the court say: "The avowed object of the law is to give to the owners of land, being riparian proprietors, in front of a navigable stream, arm of the sea, bay or harbor, the right and interest of the State in and to the land covered by water as far as the edge of the channel, and to owners who were prevented by the State's title from improving lots so situated between them and the water." And it was therein decided that the lands in dispute at the termination of streets on navigable water *including the land between high and low water mark*, were given by the statute to the city, so long as the streets exist, and with remainder to the owners of the fee of the streets to be enjoyed on the abandonment of the streets as such. 8 Fla., 325, 340, 342.

This case decides that the act is effectual; that it does contain a grant; that the grant is to riparian proprietors fronting on navigable waters; that the grant begins at high water mark and includes lands between high and low water mark; that by the statute the State " divests itself of its right or title."

In Alden and Wife vs. Pinney, 12 Fla., 348, 388, the court held that the complainant had failed to prove that he was a riparian proprietor or had a water boundary, and therefore that no construction of the statute was involved. It is to be observed, however, that the construction of this act, and the effect of the second

section were fully and ably argued, and two of the Judges who sat in this case sat subsequently in Rivas and Koopman vs. Solary, and the same member of the court delivered the opinion of the court in each case.

The statute came again before this court in Rivas and Koopman vs. Solary, 18 Fla., 122. The court therein decided that the act was effectual; that it contains a grant; that it grants the fee of the submerged land in full title, from high water mark to the channel, to the riparian proprietor, and that the State could make such grant. The court was fully informed then of all objections to the act which are brought before the court now, but it affirmed Geiger vs. Filor, and it laid down the law covering fully and unmistakably the whole subject, thus: "Anterior to this act, as riparian proprietor, his title did not extend further than high water mark; after this act it extended to the channel." 18 Fla., 126. There was no claim of title to any land below high water mark otherwise than under the act of 1856, and the above quoted decision of the court was squarely upon the case before them.

In Sullivan vs. Moreno, 19 Fla., 200, it was held that the complainant was not a riparian proprietor, not having a water boundary, and while therefore, in strictness, the act of 1856 was not further involved in the case, yet it is said in the opinion that the title to the submerged land to the channel is in such riparian proprietor as is contemplated by the act. It is also said that under the laws of this State as to the submerged

JANUARY TERM, 1891          301

The State of Florida v. Black River P. Co.—Argument of Counsel.

lands to the edge of the channel, considerations of commerce are superior to those of navigation.

In the case of Ruge vs. Apalachicola Oyster Canning & Fish Co., 6 So. R., 489, 493, it was held that the complainant was not entitled to relief upon facts of that case wholly apart from the act of 1856, and there was nothing whatever decided concerning said act. But if the side remark of the judge who delivered the opinion concerning said act is to be taken as a part of the decision, it does not help the bill of complaint now before the court; if the State has title to the submerged land in Black Creek wherefrom phosphate is being dredged, because that submerged land is in front of a park and therefore did not pass under the general grant of the act, such title of the State should be set up in the bill.

We do not perceive how the uses made of the submerged lands granted by the State can effect the titles of the grantees thereto, but if such a contention should be deemed worthy of consideration at all, we submit that the things which it is alleged in the bill that the appellee is doing are manifestly for the great benefit of commerce and in no way obstruct navigation.

Upon a review, therefore, of all the decisions of this court on the subject, it is perceived that the act of 1856 was directly involved and was the basis of the decisions only in Geiger vs. Filor, and in Rivas and Koopman vs. Solary. In each of these cases said act was the source of the title which was sustained, and it was decided that the act is effective, that it grants the

302 SUPREME COURT.

The State of Florida v. Black River P. Co.—Argument of Counsel.

full title to the submerged land, and that the grant is to the respective riparian proprietors having a water boundary, regardless of the provision of the 2d section concerning low water mark. *

In each of the other cases the decisions was made on grounds which rendered it unnecessary to construe the act as in each complainant did not make out a case for relief no matter what might be the construction of the act; but in each of such latter class of cases it is declared that the act is valid and operative and that it passed the title to the submerged lands to such riparian proprietors as were in contemplation of the legislature.

If, however, the validity and construction of this statute were open questions, (which we submit they are not,) yet we submit that the court would decide that the act is valid, and that it grants the fee in the lands between high water mark and the channel to the respective riparian proprietors bounding on the water.

Let us consider the statute itself.

The purpose of the act, as stated in the preamble, is to promote improvements of submerged lands and water lots, and the Legislature in the first section adopted the means which they considered and determined best, by divesting the State of all right, title and interest in submerged lands on navigable waters lying in front of any tract of land owned by a citizen of the United States," &c., and vesting the full title in the riparian proprietors. Here we have a grant in

full title of such submerged lands, but though the title to the land under water is so granted, yet there might be doubt of the right of the grantee to hinder or obstruct navigation on the waters over such lands, therefore it is added that they are given the full right and privilege of building, &c., and of filling as far as may be desired, not obstructing the channel, &c., and this addition is in no way a limitation of the grant of full title to the land, but is a further and express authority to obstruct navigation of the water to the extent therein authorized.

Section 2 of the act is simply a provision from abundance of caution that the statute shall not be construed to convey any of the "swamp or overflowed" land of the State or its grantees. Wherever the term "swamp or overflowed land" is used in the statutes of the State concerning public lands, it has an entirely well known and definite meaning, and designates the lands granted to the State by the United States by the act of September 28, 1850, and the meaning of said section 2 of said act of 1856 is nothing more than that the act shall not be construed to pass such swamp or overflowed lands, and the section has no other effect.

The last clause of said section 2, if taken literally and given a literal affect, would nullify and render senseless the whole act. There were no persons or bodies corporate at that time "owning lands actually bounded by and extending to low water mark on such navigable streams, bays and harbors-"

This is not a mere private grant; it is a grant as part

of an act declaring and giving effect to a general public policy of the State by means which the Legislature deemed appropriate, and one clause at the end of a section intended solely to guard "swamp or overflowed lands" will not be given a different effect, and especially will not be allowed to nullify the whole act or any important part thereof. Sams vs. King *et al.*, 18 Fla., 557; Heirs of Bryan vs. Dennis *et al.*, 4 Fla., 445.

Every tenchnical rule of construction must yield to the clear expression of the paramount will of the Legislature. Wilkinson vs. LeLand, 2 Pet., 620, 662.

"The meaning of the Legislature may be extended beyond the precise words used in the law, from the reason or motive upon which the Legislature proceeded, from the end in view, or the purpose which was designed." U. S. vs. Freeman, 3 How., 556, 564, 565.

That a State may make a grant of such submerged lands in full title and for construction of grants of such lands, see Hoboken vs. Penn. R. Co., 124 U. S., 657; Boston vs. Richardson, 105 Mass., 351, 354; Drake vs. Curtis, 1 Cush., 395, 412; Commonwealth vs. Alger, 7 Cush., 71, 79.

There is no allegation in the bill that defendant is doing anything injurious to commerce or navigation, so no ground of relief is shown under that head ; nor does the bill seek to enforce any trust for the benefit of commerce, so we need not consider whether there is

any such trust, or whether any bill for that purpose would lie.

There is no allegation that stream is tide-water. If it be tide-water and the claim of the State is of title on that ground, whether or not the court will take notice without proof, of the tide-water, yet if that be the ground of title in State it must be so alleged. The term "navigable" is a very loose one, and its meaning depends upon the subject and connection as to which or in which it is used. A stream is navigable for purpose of being navigated which is capable of being navigated So for purpose of maratime jurisdiction. But in Florida the bed of all streams not tide-waters, from each bank to the center of the stream, is vested in the owners of the abutting highlands bounding thereon, as at common law. So anyone claiming title to bed of a stream not alleged to be tide-water, whether to the channel or any other portion thereof, and though such claimant be the State, must show some title, and even if allegations of facts are sufficient to show navigability for some purposes, it is not of itself sufficient to be considered as showing that the State owns the bed or the stream even in the channel. The owner of the unsubmerged land bounding thereon, owns the bed of the stream from either side to the center, subject to the easement or right of the public to navigate it, if navigable, and to such rights and powers as the state may have to prevent obstruction or injury to navigation. There is no presumption that the State owns

the lands on either side, nor can it bring suit concerning bed of stream without any allegation of title on such presumption—on the contrary the court takes judicial notice that by the public statutes of the State, any such suit for swamp and overflowed and Internal Improvement lands must be brought by trustees of Internal Improvement fund, and as to lands held by the State for educational purposes, that suit must be brought by the State Board of Education; and that there are no lands vested in the State by virtue of its sovereignty under any stream, concerning which the Attorney-General may bring suit in the name of the State, unless it be lands not granted by the State under tide-waters. As to I. I. lands, see McL., 589; as to Educational lands, see Chapter 3872, Sec. 10. Acts 1889, p. 74.

We maintain with great confidence of the proposition that in Florida the fee of lands under streams not shown to be tide-waters is in the owners of the uplands bounding on the water.

That such was the rule of the common law is unquestionable. It is the rule of the States which have adopted and adhered to the common law, and is applied by them even to the great rivers of the West, which are continental highways of navigation and commerce, including the Mississippi. In Florida the adoption of the common law is not merely a matter of judicial inference or construction, or of custom, but it is by express statute, (McL., p. 708) and that statute

has declared the same in force when not contrary to the Constitution of the United States or statute of the State.

Where can a court of this State find authority to dispense with this settled rule of the common law? It cannot even base such action on any contention that the physical conditions, customs, or public policy of the State require it or justify it—the streams of Florida are not generally of great magnitude or very extensive navigability above tide-water, nor great highways of navigation or commerce, and so far from custom or public policy limiting the common law rights, they have been extended both by custom and express statute to tide-waters, to which they did not apply at common law, to the edge of the channel. See 3 Kent, (original paging) 344, 335; See Review of Cases in Brief of Defendant in Error, 24 How., p. 52; Jones vs. Soulard, 24 How., U. S., 41, 65; Fuller vs. Dauphin, 124 Ill., 542, S. C.; 7 Am. St. R., 388; June vs. Purcell, 36 Ohio St., 396, 406.

The very great preponderance of authority in the United States, whether the number or the character of the decisions be considered, is in favor of the common law doctrine, of the ownership of the bed of fresh water rivers by the abutting proprietors. This doctrine is certainly in force in all the New England States, in New York, New Jersey, Delaware, Maryland, Georgia, Kentucky, Mississippi, Illinois, Ohio and Michigan.

308 SUPREME COURT.

The State of Florida v. Black River P. Co.—Argument of Counsel.

It seems also to be in force in South Carolina, and in very few States has it ever been repudiated. Gould on Waters, Sections 56, 57, 58, 59, 62, 63, 69, 70, 71, 75.

"It is well settled that the rule that a grant by a river above the ebb and flow of the tide passes the soil to the thread of the stream applies as well to a grant from the State as to a grant from one private person to another." 105 Mass., 355.

We are not aware of any act of the Legislature declaring Black Creek navigable, but no declaration by the Legislature that a stream is navigable affects any rights of property in the bed; its only effect is upon the rights of navigation, and even as to those rights of navigation a statute is not conclusive.

There has been no decision in Florida which impairs the common law doctrines. The court decided in Bucki vs. Cone, 6 Southern R., 160, that the Suwannee river is navigable for floatage of logs at a certain point, but that, there being a statutory right to build a bridge there, such right of navigation does not detract from the right to maintain the bridge, if maintained without improper obstruction to such navigation. The principle decided is precisely the one we maintain here, to-wit: That a stream may be navigable in fact for certain puposes, does not affect other rights or property in the stream or its bed, (as the ownership of bed and taking phosphate from it,) provided navigation is not shown to be improperly obstructed thereby.

Nor do decisions extending maratime jurisdiction over streams above tide-water affect the question of the ownership of the bed of the stream. The decision of the Supreme Court of the United States in Jones vs. Soulard, 24 How., 41, as to ownership of bed of Mississippi river by owner of land bounding thereon, was in 1860, long subsequent to many of the decisions extending admiralty jurisdiction of the United States courts to waters not within the tides, which decisions began with "the Genessee Chief," 12 How. Nor has the case of Jones vs. Soulard ever been overruled. It is true that individual Justices of the Supreme Court of the United States, delivering opinions have in some cases expressed a preference for a different rule, but what they have decided in such cases was only that, under the descriptions and boundaries, surveys and derivations of title in each case, the claimant was cut off from the ownership of the river bed; and they say that the question of whether or not one owning land bounding on a stream owns the bed thereof is a question to be decided by the courts in each State according to its own laws. St. Louis vs. Myers, 113 U. S., 566.

Chancellor Kent states clearly the respective rights of the bounding owner and the public in a stream navigable in fact but not within tide water. He says that it is precisely as in any other highway—the public has a right to navigate it as a highway, and to pre-

vent the injury or obstruction of navigation while the owner has property in the soil. 3 Kent 344, 348, original paging; Magnolia vs. Marshall, 39 Miss., 309, (in Gould on Waters, p. 126).

If the court is to dispense with the common law rule what is to be substituted? How deep or how wide is a stream to be to change the ownership of bed from riparian owner to the State?

The extension of admiralty jurisdiction of the United States has nothing to do with the question, for if the ownership of the soil followed admiralty jurisdiction the ownership would be in the United States, which, confessedly, it is not. Admiralty jurisdiction has nothing to do with ownership of the bed of the stream; nor has the right of navigation of the water any necessary bearing on ownership of the bed. The title to the bed, like the title to all other land, is where it is simply because the technical rules of law vest it there, and if the common law vested it in the riparian owner, (which is beyond dispute) Florida having expressly adopted the common law, that would seem to settle the question for the courts of this State.

In all the South Carolina cases where the title to the land covered by water and the phosphate deposit thereon has been held to belong to the State they have been lands under waters, both navigable in fact and tide-waters and so shown to be. State vs. Pacific Guano Co., 22 So. Ca., 50, 52, 75; State vs. Pinkney,

Id., 484; State vs. So. Ca. Phos. Co., Id., Appendix, 593.

And in that State it has been uniformly held that wherever the State has granted the land below high water mark, that such grant carries the full title and the phosphate belongs to the private owner. 22 So. Ca., 80, 84, 601.

The State has no right to the phosphate or to a royalty thereon, unless it owns the land. Whether the common law rights of the sovereign to royal mines or minerals is of any effect in this State it is unnecessary to discuss, as such rights applied only to gold and silver. 1 Blackstone, 295.

Owners of such submerged lands own such deposits and everything which forms a part of attachees to the land, including not only such minerals or deposits which necessarily become mixed with the other components of the land, but even ice formed on the water over the land. 76 Maine, 76; 65 Mich., 341; 36 Ohio State, 396.

BRIEF ON DEMURRER TO BILL OF COMPLAINANT OF H. BISBEE.

The case made by the bill is too vague and uncertain to enable defendant to make a defence.

First paragraph of bill, alleging mining phosphate in the bed of Black River without specifying *any point* or place.

Second paragraph of bill alleges that the "bed of the river from which said phosphate rock and phosphatic deposit was *so taken*, is about *one mile below* Middleburg in said county, and that the river above and below this point is navigable for certain crafts. There is no averment in this paragraph that *defendant* has *taken* any phosphate or phosphate rock, from the point *at Middleburg*, or *anywhere else.* "So taken" applies to the manner or mode of taking, and not to the person, or persons who took it, and is as applicable to anyone else as to defendant. This paragraph does not make an *averment* in respect to defendant.

3. The third paragraph of the bill, alleges as in the *first* paragraph, that defendant has taken and mined phosphate rock, &c., "*from the bed of said river*" without specifying any time or place.

4. Alleges want of knowledge of the proportion from the bed not a part of the channel, and that taken from the bed *underlying the channel*, without any averment that *defendant has mined from the bed of the channel.* And this is followed by an averment that defendant is trespassing upon, and mining from "*the entire bed covered by the water of said river at its ordinary volume.*"

This averment is broad enough to admit testimony as to defendant's mining in the entire river from its source to its mouth, and on *any* part *covered by water.* This is utterly inconsistent with the attempt in the

second paragraph of the bill, to allege the mining at a *particular point*, to-wit:   a mile *below Middleburg*.

The bill then prays for an injunction restraining defendant from mining in any part of the bed of the river—essentially a fishing bill.

It is obvious this bill is too vague and uncertain. 1 Story's Equity, sec. 242; 1 Story's Equity, 249.

The bill should be so specific as to the title and right to sue on the part of the complainant, that the court can determine *whether or not* the complainant has any *legal right* or title to maintain the suit.   Id., sec. 257.

And so specific, that defendant may protect itself from a *discovery of any part thereof by plea*, if he can.

### TIDE-WATER.

1. There is no averment this is a tide-water stream.

2. There is no sufficient averment that it is a navigable river.

But admitting the averment is sufficient as to navigation at Middleburg, there is no averment, how far above or below Middleburg is it navigable.

It is apparent that as to any part of the river not navigable, defendant would have quite a different defence from its *defence at points where it is navigable*.

### TITLE OF STATE.

The State does not allege that it is the *owner*, or has

the *fee to any* part of the bed of *this river*. 20 Florida, 200. Defendant does not know whether or not, the States's claim is that of riparian *owner*, or as a *sovereign independent* of any claim as a riparian owner. We are entitled to know upon what ground the State claims in order to prepare our defence. Story's Pleading, sec. 257; Story's Pleading, sec. 255, 256.

The State ought *to be held* to greater particularity as to locality, so that defendant can plead *license*, or a claim as riparian owner or deny title in the State and aver title in defendant, and thus avoid a discovery. Story's Equity Pleading, sec. 652.

Want of certainty proper ground of demurrer. Id., sec. 528.

There is no averment that this is a public navigable stream, or a *natural stream*. Court does not take judicial knowledge of whether it is one or the other, or a private artificial stream.

#### REMEDY AT LAW TO TRY TITLE.

The act of 1856, Florida Legislature passed the fee and exclusive ownership to the riparian owner. Hoboken vs. Penn. R. R. Co., 124 U. S. Rep., 691.

In this case it was held the grantee of the land (covered by water) by the State was as exclusively his own for all purposes as the owner in fee of any land, subject to the public easement of navigation. So held in Stevens vs. R. R. Co., 34 N. J., Law, 532.

### TIDE-WATER—NAVIGABLE WATER NOT TIDE-WATER.

Whether or not the fee under navigable waters *above* tide-waters, is in the State, or riparian owner, is a question for each State to *determine*. The Federal government having nothing to do with the subject. Barney vs. Keokuk, 94 U. S., 338.

The only reason why it was originally in the State, was because it was thought safer that the sovereign should have the fee in *trust for the benefit of commerce and navigation*, than for the riparian owner to have it. Id., 329, 337-8.

### RULE IN FLORIDA.

Neither before or since the act of 1856, has the Supreme Court held, the fee above tide-waters was in the State.

The language of that act when carefully examined, indicates that it only applies to tide waters.

### NATURAL OR ARTIFICIAL.

Federal Court sitting as a Court of Admiralty, take judicial notice that the waters upon which a contract of affreightment is to be performed are navigable. 4 Fed. Rep., 477; 9 Wheaton, 379; 10 Wheaton, 428; 7 Peters, 342.

The facts which make a stream a natural public navigable stream, should be stated. So the court can determine whether or not it is navigable for the pub-

lic. The *presumption* is that fresh water streams are not navigable, and when the facts are ascertained, it is a question of law for the court to *determine*. Rhodes vs. Otis, 33 Ala., 578, cited in note, 5 Am. Dec., 109.

The presumption is that a river above tide-water is unnavigable, burden of proving contrary on him who asserts it. Ohio vs. State, 5 Southern Rep., 653, 655.

Court judicially knows what waters are above the ebb and flow of the tides. Id., 655, and that the bed of the river is included in the United States Surveys, Id., 656. 13th Florida, 200; 19th Florida, 124 U. S., 657, 691; 3 Kent, 344—It is a settled principle, &c., several pages; 24 How., 41, 65; 113 U. S., 566; 36 Ohio St., 124 Ill., 7 Am. St. R; Gould on Waters, quoting Mississippi and Michigan cases; New York; 39 Miss.

TAYLOR, J. :

On the 23d of October, 1890, the State of Florida filed its bill of complaint in equity in the circuit court for Clay county against the Black River Phosphate Company, a corporation organized under the laws of Florida. The allegations and prayers of said bill, omitting its formal parts, are in the words following:

"(1.) The said company has for a year or more wrongfully, wilfully and unlawfully entered upon the bed of Black river, also known as 'Black Creek' and has wrongfully, unlawfully and willfully dug,

mined, removed and appropriated therefrom, and is now unlawfully and willfully so doing, phosphate rock and phosphatic deposit imbedded therein, in Clay county, Fla., and the said company is now and has been in possession of, and operating upon, the waters of said stream, within said county, pumps, dredges, lighters, scows and steamboats, and other appliances and facilities, for digging, mining, removing and appropriating phosphate rock and phosphatic deposit from the bed of said river.

"(2.) The bed of said river from which said phosphate rock and phosphatic deposit was so taken, and is so being taken, is about one mile below Middleburg, in said county. The said river is at this point, and above and below it, navigable, and is of depth sufficient for boats drawing three feet and more of water, and is capable, in its ordinary volume of water, of transporting the products of the forests and fields along its bank to market; and the said stream, at, above, and below the places in the bed thereof from which said phosphate rock and phosphatic deposit have been and are being so taken, is in fact used in its ordinary condition as a highway of commerce, upon which the products of the country have been and are transported to market, and said stream, at above, and below said points, is of sufficient depth and capacity for valuable floatage.

"(3.) The said defendant company has so dug,

318 SUPREME COURT.

The State of Florida v. Black River P. Co.—Opinion of Court.

mined, removed and appropriated from the bed of said river a large quantity of said rock and deposit, to-wit, five thousand tons or more, and is now removing therefrom said rock and deposit at the rate of two hundred tons per day or more. These phosphate rocks and phosphatic deposits are valuable, and the said company has sold, and is selling the same at the price of ten dollars per ton or more, and has appropriated and is appropriating the same exclusively to its private uses, and not in anywise for the benefit of commerce.

"(4.) Your orator is not advised of the proportion of said rock and deposit which said defendant has been and is taking from the bed of said river underlying the waters embraced between the ordinary water-mark on either side of said river, as distinguished from that taken from the bed underlying the channel thereof, but your orator avers that said defendant has been and is trespassing upon, digging, mining, removing, and appropriating said rock and deposit wrongfully, indiscriminately, from the entire bed covered by the water of said river at its ordinary volume.

"(5.) Your orator has no information of the precise quantity of said rock and deposit so dug, mined, removed, appropriated and sold, nor of the disposition made by the said defendant thereof, nor the price obtained therefor, as to all of which your orator avers

it is entitled to a discovery from said defendant; which discovery the said defendant can and should be required to make.

"(6.) And your orator further shows that said defendant threatens, and will, unless restrained by the order of this honorable court, continue to trespass and enter upon the bed of said river, and so dig, mine, remove, and appropriate said rock and deposit in the bed of said river, and that your orator is remediless, except in and by the process of this honorable court, to restrain and prevent the said trespassing and entering and digging, mining, removing and appropriation by said defendant company of said rock and deposit.

" And your orator prays that the said defendant, its officers, agents, employees, and servants, may be presently enjoined and restrained from trespassing and entering upon the bed of said Black river, and from digging and mining therein, and from removing and from appropriating said phosphate rock and phosphatic deposit therein, and that at the hearing hereof the said defendant, its officers, agents, employees, and servants, be perpetually enjoined and restrained from trespassing and entering upon the bed of said Black river, and from digging and mining therein, and from removing therefrom, and from appropriating said rock and deposit therein; that it be referred to a master of this court to take and state an account, under the directions and instructions of this

court, of the quantity and quality of said rock and deposit so dug, mined and removed by the said defendant from the bed of said river, and the value thereof, and the price for which the same has been sold by the said defendant, and also an account of the quantity, quality and value of the said rock and deposit, so taken from the bed of said river, in the possession or under the control of said company; and that the said company be required, by the decree of this court, to pay your orator the purchase price therefor, and to pay to your orator the value thereof so ascertained upon said accounting; and that your orator may have such further and other relief," etc.

To this bill the defendant below interposed a demurrer, assigning therein as grounds of demurrer the following :

"(1.) The allegations of said bill are too uncertain, vague and indefinite.

"(2.) The bill does not set out with sufficient certainty the claim of complainant in the subject-matter of the suit.

"(3.) The bill does not sufficiently set out title of complainant in the subject-matter of suit.

"(4.) The bill does not set out with sufficient certainty to what portion of the stream mentioned, or bed thereof, complainant's claim extends.

"(5.) Complainant does not allege that said stream

or portions thereof, from which phosphate is alleged to be taken, or on account of which relief or discovery is sought, is within tide-water.

"(6.) And for other grounds appearing on the face of bill."

Upon the hearing of this demurrer the court below made the following order:

"This cause came on to be heard upon the demurrer to the bill filed herein, and was argued by counsel. Upon consideration thereof, the court is of opinion that Chapter 791 of the Laws of Florida vested in the riparian proprietors the fee in all lands covered by water lying in front of any tract of land owned by any citizen of the United States situated upon any navigable stream as far as the edge of the channel. While the act is entitled 'An act for the benefit of commerce,' and the Legislature deemed it for the interest of commerce that all submerged land and water privileges should be improved, they granted the full title to the same to the riparian proprietors, to induce them to incur the expense of making the improvements which the Legislature deemed important for the benefit of commerce. This seems to be the view entertained by the Supreme Court of this State in so far as it has expressed any opinion on the subject. Entertaining this view of the law, the court does not deem it necessary to express any opinion upon the question as to whether

or not the State owns the soil in the channel of rivers and streams in which the tide does not ebb and flow, though in fact capable of navigation. The court is of the opinion that the demurrer is well taken. It is therefore ordered, adjudged and decreed that the demurrer to complaint's bill herein be sustained. It is further ordered and decreed that the complainant have leave to amend its bill as it may be advised."

From this order sustaining the demurrer the complainant appeals to this court.

It will be observed from these pleadings that nowhere therein does it appear that the defendant in the bill, or any one else, owns, possesses, controls or claims any land bordering upon the margin of the stream mentioned, so as to give the defendant the *status* or rights of a riparian proprietor, whatever such rights may be found to be upon thorough judicial inquiry. And it nowhere appears in the pleadings or record that the alleged operations and trespasses of the defendant have been carried on or committed under or by virtue of any claim of right as riparian proprietor or otherwise, yet the court below, in passing upon this demurrer, seems to have based his ruling thereon upon the theory or supposition that the defendant is a riparian proprietor upon the stream in question, and that under the provisions of Chapter 791, Laws Florida, (sections 1, 2, pp. 689, 690, McClel. Dig.,) the fee in the bed of the stream in question, as far as the edge of the chan-

JANUARY TERM, 1891.    323

The State of Florida v. Black River P. Co.—Opinion of Court.

nel thereof, has been vested in the defendant as such
supposed riparian proprietor, and that therefore the
defendant, being such owner of the fee in this stream,
had the right there to carry on the operations com-
plained of. Exactly how the question of riparian pro-
prietorship, and the extent of the rights attendant
thereon, came before the court we cannot discover from
the record, and hence must assume that it arose in the
oral arguments of counsel at the hearing upon the de-
murrer. In the exhaustive presentation of the case
before this court by counsel for both the appellant and
appellee, much time was devoted, and many authori-
ties quoted, upon the questions of the relative rights of
the State and riparian owners in the beds of navigable
water-courses; it being contended for the appellant that
the State, by virtue of its sovereignty, owned and con-
trolled the entire beds of all navigable streams within
her borders, and all valuable deposits therein, whether
the waters thereof were fresh or salt, and whether the
tides of the sea ebbed and flowed therein or not; while,
on the other hand, it was contended for the appellee
that the riparian proprietors on all non-tidal streams,
whether navigable in fact or not, owned the beds thereof,
and all deposits therein, *ad medium filum aquæ*, under
the common law of England on this subject claimed to
be in force here, independently of our statute; and that,
if this contention was untenable, they certainly owned
the fee in the beds of such streams to the edge of the
channels thereof under the provisions of our statute.
In view of the recent discovery of the existence in the

324　　　　SUPREME COURT.

The State of Florida v. Black River P. Co.—Opinion of Court.

beds of our water-courses of phosphatic deposits in such reputed quantities and of such high value as very materially to enhance the property and commercial interests of our state, we realize fully the importance of a prompt judicial determination of the several highly important questions presented in the briefs and arguments of the counsel in this case, so that the public rights of the State and the private rights of individuals affected thereby may be positively and speedily known and established. But we are asked in this case to pass upon and to adjudicate the rights of a riparian proprietor whose existence, so far as the record shows, is purely imaginary, with nothing whatever in the record that even suggests his presence in this case. Without violently trampling upon all rules and precedents, we cannot undertake, with the record before us, to consider questions, rights or issues that are not raised by or included in the proceedings brought here for review, particularly when the rights and questions thus supposititiously presented *dehors* the record are of such grave importance to the state and to many of her private citizens. Without passing upon the correctness or incorrectness of the opinion of the court below construing the effect of the statute, (Chapter 791, *supra*,) in a proper case made calling for a construction thereof, we think that a construction of the statute, under the pleadings presented at the hearing of the demurrer, was premature, there being nothing whatever in the issue raised by the bill and demurrer thereto that warranted a consideration of this statute. The case, as

presented by the pleadings, is, in short, that Black river is a navigable stream, and that the defendant is trespassing therein by the removal and appropriation from the bed thereof of phosphatic deposits that are valuable as a commercial commodity. By virtue of what claim of right, if any, the alleged trespass is committed, does not appear. The bill is demurred to because it does not specifically allege any present title or ownership in the complainant to the premises trespassed upon, and because of the vagueness and indefiniteness of the allegations declaratory of the extent of the complainant's claims therein. It is nowhere alleged in the bill that the State of Florida is the owner of or entitled to the bed of the stream mentioned, or to any part thereof, or to any deposits removed or being removed therefrom; nor is there any specific allegation that any property or proprietary rights of the State have been infringed upon in the acts, proceedings or trespassings complained of. Neither is there any allegation that the usefulness and efficiency of said stream as a public highway for commerce is deleteriously affected in any way by reason of the alleged acts complained of, nor is the remedy sought because of any alleged injury or threatened injury to the stream as a public commercial highway. If the bill had contained a specific allegation that the State of Florida was, at the time of the filing thereof, the owner of or entitled to the bed of the river in controversy, at the point or points trespassed upon, and to all deposits therein, and that at such point or points it was in fact navigable or

susceptible of useful navigation to the public, and that its property rights therein were being trespassed upon as alleged, and threatened with frequently recurring trespassings, or that the efficiency of such stream as a public highway for commerce was being injured or destroyed by the acts complained of, then the demurrer should have been overruled, and the defendant put to its answer to show, if it could, the right or claim of right, under which its operations there were being conducted. It was strenuously insisted for the appellant that no direct allegation of title or ownership in the State was necessary ; that the statements of the bill, to the effect that the stream was navigable in fact, and useful as a public highway for commerce, was of itself a sufficient averment of title in the State to the bed of such stream, and all valuable deposits therein ; that the ownership by the State was the only inference and logical sequence that followed and flowed out of the allegation that the stream was in fact navigable. We cannot agree to this proposition that the statement of one fact that constitutes only an essential element of the main fact necessary to be alleged, viz., the present title or ownership of the complainant, is a sufficient allegation of such leading fact. In Story Eq. P., §241, that learned author says : "It may be affirmed as an elementary rule of the most extensive influence that the bill should state the right, title or claim of the plaintiff with accuracy or clearness ; and it should, in like manner, state the injury or grievance of which he complains, and the relief which he asks of the court. In

other words, there must be such certainty in the averment of the title upon which the bill is founded that the defendant may be distinctly informed of the nature of the case which he is called upon to meet." And again, in section 27, the same author, in treating of the construction of bills, says: "The third party is the premises, or, as it is more usually styled, the stating part of the bill, which contains a narrative of the facts and circumstances of the plaintiff's case, and of the wrong or grievance of which he complains, and the names of the persons by whom done, and against whom he seeks redress. This part, constituting in truth the real substance of the bill, upon which the court is called to act, requires great skill and judgment to frame it aright; and, if it has not the proper legal certainty, the defect, unless removed, may become fatal in every subsequent stage of the cause." Milf., Eq. Pl., 65. In Coop. Eq. Pl. the rule is stated thus : "It is, then, absolutely necessary that the bill should state the right of the complainant to what he seeks of the court, and the injury which he complains of; and both, by the standing orders of the court, ought to be plainly, yet succinctly, alleged, and that with all necessary and convenient certainty as to the material circumstances of time, place, manner and other incidents." Ryves vs. Ryves, 3 Ves., 343 ; Cresset vs. Milton, 1 Ves. Jr., 449 ; Cruger vs. Halliday, 11 Paige, 314 ; Gould Pl., 160 ; Sullivan vs. Moreno, 19 Fla., 200.

The importance of a direct averment of a present title or ownership in the State to the bed of the

stream in question becomes further apparent when it is considered that even though the State does, by virtue of her sovereignty, own and control the entire beds, and all deposits therein, of all streams within her borders that are in fact navigable by the public in the conduct of useful commerce thereon, whether the waters of such stream be salt or fresh, and whether the tides of the sea ebb and flow therein or not—a rule that we are of the opinion should obtain here upon the great weight of the American authorities, (Gould Waters, §§ 53, 79; Barney vs. Keokuk, 94 U. S., 324; Bullock vs. Wilson, 2 Port., (Ala.), 436, McManus vs. Carmichael, 3 Iowa, 1; Railroad Co. vs. Schurmeir, 7 Wall., 272,)—yet the proprietary rights of the state therein, prior to the time of the filing of the bill, may have been granted away by one or the other of the two sovereignties, Spain and England, to both of whose dominions belonged at different periods the territory now known as the State of Florida, to say nothing of the possibility of the existence of a grant anterior to the bill by the State herself, if it should be found that through her Legislature she had the power to make such grant.

It follows that the order of the court below sustaining the demurrer to the bill must be affirmed, not, however, upon the grounds or for the reasons stated in the opinion of the court below sustaining the demurrer, but because of the insufficiency, uncertainty and vagueness of the allegations of the bill. The order appealed from is affirmed.