STELLA DUMAS, APPELLANT, VS. REUBEN B. GARNETT, APPELLEE.

1. The riparian act of December 27th, 1856, Secs. 454, 455, Rev. Stat., does not include riparian or latteral proprietorships on all navigable waters, but only those on a navigable stream, bay of the sea, or harbor.

2. Whether land which does not extend down to the bank of a navigable stream whose banks are the subject of overflow by the ordinary tides, but is reached by such overflowing waters, is riparian to such stream, within the meaning of the riparian act, not decided.

3. Where it is not shown that land claimed to be riparian to a navigable stream was such at the passage of the riparian act

Stella Dumas v. Reuben B. Garnett.—Statement of Case.

of December 27th, 1856, Sections 454, 455, Rev. Stat.; or has become so since (assuming that such change of condition would bring it within the statute), a verdict averse to the owner of such land asserting, through it, a right to the benefits of such act must be sustained.

STATEMENT.

In 1805, on the 9th of January, Enrique White, the Spanish political and military governor of St. Augustine, Florida, and its province for H. M., granted to Gaspar Papy five and a half acres of land bounded by the south with the Bartola Suarez lands, by the east with the "Zacatel," by the north with the road that goes from the city to the new fair, and by the west with Juan Bourquat's lands. The shape of the tract, according to the accompanying plan of the survey is a quadrilateral, the eastern and western sides of which are parallel, whereas the northern and southern sides verge a little towards each other from east to west, the western side being about five-sevenths the lenth of the eastern side, and about one-third the length of the northern. It is also spoken of in the title as five and a half acres of land on the New Fair Road; and in the original survey made by John Travers, the words "towards the new ferry," are used instead of "to the new fair." On November 14th, 1835, Francis Gue and Joseph S. Sanchez, executors of Anna Pona Papy, the widow of Gaspar Papy, conveyed to William Eldridge a parcel of land containing "five and a half acres, more or less, as will appear by a survey of the same made by John Travers, * * bounded * * on the south by the land of Mary Cooper, on the east by marshes of Bridge Creek, on the north by the street which leads to Avice's Ferry, and on the west and south by land of——Lewis," which said

land is situated in St. Augustine, Florida; and El-
dridge conveyed it, by the same description, to Theo-
dore Flotard, May 14th, 1836. On April 2d, 1838,
Flotard and Smith Woodhull, trustee of William
Woodhull and John W. Woolsey, conveyed to Peter
Sken Smith the land, referring to the survey, and
also describing it as "bounded on the north by a
street leading to what was formerly known and called
Avice's Ferry; on the south by land lately the prop-
erty of Mary Cooper or of her children; on the east
by the marshes of Bridge creek, sometimes called
Maria Sanchez creek, and on the west, and partly on
the south, by property lately sold by the * *
said Theodore Flotard to said Smith, and formerly
known as the Mitchell Grove, * * and is the
same that was originally granted to Gaspar Papy, &c.,
&c." On May 15th, 1838, Smith mortgaged the prop-
erty to Smith Woodhull, as trustee for William Wood-
hull and John Woolsey, and on July 30th, 1846,
Woodhull, trustee, assigned the mortgage and unpaid
indebtedness secured thereby to Amelia Dumas; and
on June 25th, 1847, a decree of foreclosure and sale was
rendered thereon in the Superior Court of East Flori-
da, in favor of Amelia Dumas against said P. S. Smith,
Christopher Andrews, Thomas Cosby and Orloff M.
Dorman, in which decree the property is described the
same as in the mortgage, the only variance between
such description and that in the deed to Smith being
the use of the words: "The marshes or Bridge creek,"
for "the marshes of Bridge creek." On September 6th,
1847, Joseph S. Sanchez, sheriff of St. Johns county, un-
der a sale made pursuant to such decree, conveyed to
Amelia Dumas, the land, describing it as in the stated
mortgage. It should be stated in connection with the
variance of description mentioned, that in the mort-

gage and subsequent instruments referred to the land is specially mentioned as being the same granted to Gaspar Papy, and afterwards sold by the executors of his widow to Eldridge, and by him to Flotard.

Amelia Dumas died unmarried and without issue in the year 1861, leaving surviving her her father, Peter B. Dumas, as her heir, and he died in 1869 intestate, leaving his wife, Rose B. Dumas, and a son, Henry B. Dumas, and a daughter, Stella Dumas, the plaintiff, as his heirs. On October 24th, 1871, Henry Dumas conveyed all his interest in the estate of his father to said Rose B. and Stella Dumas, and in 1873, Rose B. Dumas died, having made her last will and testament by which she gave all her property, real and personal, to the Rev. Augustine Verot, the Roman Catholic Bishop of St. Augustine, and his successors in office, the said will having it would seem, been admitted to probate in St. Johns county in August of the year last stated. On July 13th, 1874, Bishop Verot and plaintiff agreed, by writing under seal attested by two witnesses, to a division of the property of said Peter B. and Rose B. Dumas, by which agreement it was provided, *inter alia*, that the said "Stella Dumas will own and possess and retain in fee simple the tract of land called 'the Grove,' which is bounded north by Bridge street, east by Maria Sanchez creek, west by the Sebastian river, and south by what is known as the Hernandez, now claimed by George Atwood, and 'Wheadman' tracts of land." This instrument was also executed by Henry B. Dumas as a quit-claim to the property described in it. On August 3rd, 1877, Bishop Moore, the successor of Bishop Verot, executed to Stella Dumas a deed whereby he "remised, released and quit-claimed" to her the last described land,

such deed purporting to be an execution of the preceding agreement.

Henry B. Dumas, testifying in behalf of the plaintiff, stated that at the execution of the deed by Bishop Moore, the plaintiff was in possession of the land described in it. That since 1869 he had been her agent for the transaction of all her business, and had had charge of these lands and control of all her deeds and other papers. That Peter B. Dumas was, in his lifetime, the agent of Amelia Dumas for the transaction of all her business and had the control of her lands and custody of her papers.

Francis Gonzales testified that he had heard the word "zacatel" used in Mexico, that it is a Spanish provincial word, and means the place where the grass grows. "Zacate" is the grass. The cattle will eat it. It is applied to a dry place where the grass grows. That he was not familiar with its use in Florida, and could not tell whether it means here lands covered with water or not. That in Spanish "shore" is "orilla."

Venancio Sanchez testified that he had lived in St. Augustine a great many years, and knew the meaning of the provincial word "zacatel" in Florida. "Zacatel" means occasionally covered with water where salt marsh grass grows. "Cienque" means low lands on high ground. Zacate means salt grass. "Zacatel" is the place where "zacate" grows. It would not be "zacatel" where the tide ebbs and flows unless there was grass growing under the sea.

Francis P. Sanchez testified that he had lived many years in St. Augustine. "Zacate" means marsh grass. "Zacatel" means the place where there is a large body of marsh grass.

Henry B. Dumas, recalled, stated that Amelia Dumas, upon getting her deed from Sanchez, sheriff, took possession of the lands described in it. "I can't say exactly how she did so; the lands, the most of them, cultivated and enclosed in a fence. My father lived in the vicinity on his homestead. He had control of Amelia's lands as her agent, and enclosed the Papy grant in the same lot as his homestead; same fence around both. House on homestead was built year after Amelia bought Papy grant. I went away to Savannah in 1849, when I was 20 years old, and did not return to stay till 1869; was back home occasionally and saw the premises. The road to the ferry on Avice's and Vaill's ferry is not known as Bridge street. The Suarez grant, afterwards the Cooper lands, bound the Papy grant on the south. The Bosquet grant is the west. At the time of the deed to Amelia Dumas, there was a trail running along the western edge of the marshes of Maria Sanchez creek. The marshes were all flooded by "the tide at high, and were left dry at low tide." The trail was covered by ordinary high tide, but at low tide it was left bare. That as agent for Stella Dumas he had since his return from Savannah resided on these lands. On cross-examination, he stated that his father. P. B. Dumas, built his house on the grant to the east of the Papy grant. One fence enclosed both grants. The fence extended east to the west side of the trail. Witness does not recollect a ditch being there—not on the east side. There was a fence on the west side of the trail; can not give the distance; thinks it was 10 to 20 feet west of the trail. There were tenants on the tract on the west side of the trail; they were on high land; did not see any posts put down for fence; never saw any change in position of fence. It had

been there since he could remember; is still there; is the fence now on the west side of Washington street. Has made sales of land on Papy grant since father's death. All sales he made were to the west of the trail. Did not exercise acts of ownership to lands east of trail. Has been aware of buildings put upon the land occupied by Garnett. Re-direct: When witnesses' sister Amelia got deed to Papy grant there were tenants on it, and they became her tenants. The houses so occupied were not on the lands for which this action is brought. Knows where the lands described in the declaration and occupied by defendant are. "They are on what is known as the marsh, directly east of Washington street opposite the land of the Papy grant, now occupied, heretofore sold by Stella Dumas, and between them and the channel of Maria Sanchez creek.

Alexander Bryant, for plaintiff, deposed that he knew the Papy grant south of Bridge street. Lived near there before there was any filling of the land below the water east of Washington street. East of the trail the land below ordinary high tide was bare. It was some distance to the grass (as far as the length of this room), but can not give the distance. It was sand and mud and marsh, all mixed together.

Toney Huertas, for plaintiff, testified that he had lived in St. Augustine 78 years, and known the Papy grant ever since he was a child. Peter S. Smith at one time owned and occupied it. It was fenced after Smith bought it. He laid it out into lots and set out trees. He owned the Bosquet grant and the Crosby lot. At the time Smith owned these premises there was a trail across them to the Segui plantation. The trail was covered by water run upon the land to the west of it at high tide till a ditch was dug to keep it

out. East of the trail the ground was marsh and land. The trail was on the east side of the ditch. From the trail to the edge of the marsh grass was about 30 feet. The trail was not flooded at ordinary tide, but the marsh grass was flooded. The marsh grass and field grass ran in spots.

CROSS EXAMINATION: The marshy ground did not extend to the trail. No grass grew where people walked. Gaspar Papy put up a fence. Witness did not assist in doing it. Afterwards Smith rebuilt it. Witness never had any conversation with Papy or Dumas as to the east line of this tract. Smith rebuilt fence in same place. When he sold to Crosby, he sold an extreme end of the grant. We worked inside of the ditch. The ditch was outside of the fence, and about four feet west of the trail. Carriages went along the trail.

RE-DIRECT: Carriages were not driven along the trail. We used to go down to the point to cut grass for the horses. The trail was not fenced on the east side. It was an open prairie like to the east.

Appeal from the Circuit Court for St. Johns county.

*Rude & Dewhurst*, for Appellant.

*Geo. W. Lount*, for Appellee.

RANEY, C. J.:

This is an action of ejectment instituted by appellant against the appellee to recover a certain piece of land in the city of St. Augustine, in St. Johns county, described in the declaration as situated at the corner of Bridge and Washington streets, beginning at the southeast corner of such streets, running thence southerly along Washington street 168 feet, more or less, to

the north line of lands occupied by James B. Thomas; thence easterly along the line of the lands occupied by said Thomas 145 feet, more or less, to the lands of H. M. Flagler; thence northerly along the line of the lands of H. M. Flagler 168 feet, more or less, to Bridge street; thence westerly along the "north" side of Bridge street 145 feet, more or less, to the point of beginning, excepting therefrom several premises along the north side of said lot occupied respectively by Hannah B. Davis, James D. Snowden, Mary A. Hartrig and Jacob A. Spencer, and the premises in the southwest corner of said lot occupied by Charles Stewart, containing about 18,000 square feet of land. Mesne profits are claimed from January 26th, 1883, at the yearly value of $200.

As is evident from the preceding statement, the land sued for is not within the calls of the Spanish grant to Gaspar Papy, nor within those of any of the subsequent title papers down to the agreement of July 13th, 1874, between the plaintiff and Bishop Verot. The description in this paper and that in the quit-claim deed from Bishop Moore to plaintiff may be said to include it, but neither of these instruments was intended or had the effect to create of itself an interest in any land as to which the parties thereto were not jointly interested before. Assuming, for the purpose of this case, that the extreme western line of the "zacatel," which was the eastern boundary of the Papy grant, may have been below the line of high tide, it is still indisputable that such eastern boundary extended no further eastward, and is not shown to have reached the creek. It is also clear that neither the plaintiff, nor any of her predecessors in title, has ever exercised any actual dominion, or *pedis possessionem*, over the land east of this eastern boundary of the Papy grant.

The width of Washington street is not shown, and if we concede that the western boundary of the "zacatel" may have been twenty or even thirty feet east of the tract, or of the west line of the street, there is still nothing to show that the west boundary of the land sued for is not still further east, or that it is within the calls of the Papy grant, or any title paper antedating the agreement with Bishop Verot. Under these facts the sole basis of any claim upon the part of the plaintiff to title to the land in controversy is the riparian act of December 27th, 1856, secs. 454, 455, Rev. Stat., and a riparian ownership of the kind contemplated by it. The ownership or title to which the act adds the title of "submerged lands" is that "any tract of land * * lying upon any navigable stream, or any bay of the sea, or harbor," and it is "into streams of water of the bay or harbor" that structures may be built or the filling up from "the shore, bank or beach," be done, and it is to such "riparian proprietors" that previous improvements are confirmed. It is palpable that it was not the intention or effect of the act to include within its beneficial purposes all riparian or littoral proprietorships; on the contrary, all riparian or littoral lands not on a stream, or on a bay of the sea, or on a harbor, are beyond the terms and spirit of the law, however navigable the waters washing their shores may be. There are authorities to the effect, to say nothing more, that in this country, all tidal streams are *prima facie* navigable. Bucki vs. Cone, 25 Fla., 1, 6 South. Rep., 160; Sullivan vs. Spottswood, 82 Ala., 163; Walker vs. Allen, 72 Ala., 456; Gould on Waters, sec. 43. The plaintiff here has been content to rest on this rule, and we shall, without pursuing the investigation of the subject any further, accord to her the full

benefit of its presumption that the Maria Sanchez
creek is a "navigable stream," within the meaning of
this expression as used in the statute referred to.
Presuming, then, from its tidal character that the
named stream is navigable, however contrary might
be found the fact upon due inquiry (State vs. Black
River Phosphate Co., 27 Fla., 276, 9 South. Rep.,
205; State vs. Pacific Guano Co., 22 So. Ca., 50, and
authorities *supra*), the question for solution is whether
or not the Gaspar Papy land was, at the passage of the
riparian act, land "lying upon" or riparian to Maria
Sanchez creek, or has since become so, if it be such
subsequent change of condition would bring it within
the benefits of the statute. The cases of Alden vs.
Pinney, 12 Fla., 348, and Sullivan vs. Moreno, 19 Fla.,
200, relating to lands on Pensacola bay, go to the ex-
tent of holding that there must be a water boundary;
or, in other words, there must not be any land inter-
vening between that of the claimant of the benefits of
the act, and the water. Of course there is no pretense
or claim here to any land riparian to any bay of the
sea or harbor. If this was the case, the record would
tell us something about the shore of the bay or har-
bor, and then the question would be whether the land
to which it was claimed that the benefits of the act
had attached extended down to high water mark or
low water mark, as the requirements of the act may
be. There is nothing in the record on the subject of
the shore. There is hardly more as to Maria Sanchez
creek, its exact locality as to the Papy grant, or the
character of its banks or its immediate surroundings.
From Tony Huertas, who had lived in St. Augustine
since 1809, and knew the Papy grant since he was a
child, we learn that Smith, who appears to have
bought in 1838 and held till 1847, laid it out in lots

and set out trees, and that there was then a trail across the premises, and that "east of the trail the ground was marsh and land;" that marsh grass was flooded at ordinary tide, and the trail at high tide, and that the marsh grass and field grass ran in spots. That it was like an open prairie to the east of the trail. This testimony relates to a period anterior to Amelia Dumas' purchase of the Papy grant, which was in September, 1847. Henry B. Dumas informs us that this trail along the western edges of the marshes of Maria Sanchez creek, was there when Amelia Dumas purchased, and that the marshes were all flooded by the tide when high, and were left dry at low tide. That he has been aware of buildings put upon the land occupied by Garnett, and sued for, and that these lands are on what is known as the marsh directly east of Washington street, opposite the land of the Papy grant now occupied, and heretofore sold by Stella Dumas, and between such latter lands and the channel of the stated creek. Alexander Bryant informs us that before there was any filling in the land below the water east of Washington street was bare; that it was some distance to the grass; and it was sand and mud and marsh all mixed together. We understand the last clause to be descriptive of the space east of the trail or of the west line of the zacatel. It is, in our judgment, impossible for us to hold, upon this record, that the water, even at high tide, reached the eastern line of the Papy grant on the 27th day of December, 1856, the date of the approval of the riparian act. It is clear that a street had been established, and that lands east of this street had been filled in, and it is not shown that this had not been done prior to the date last mentioned. It is mere assumption to say that at that time Amelia Dumas' eastern boundary

extended even to high water mark, or was reached by the ordinary high tides. It is impossible to locate, from the evidence before us, the line of high tide at any time subsequent to September, 1847, the date of conveyance to Amelia Dumas. Changes of the character indicated having taken place since then, it devolved upon the plaintiff to show either that those changes had not taken place before the riparian act, or that she had made them and they were confirmed to her by the last clause of the first section of the statute. The proof is, however, that she had never exercised any dominion over the *locus in quo*, or any part of the territory east of the grant. We are unable to see how the jury could have come to any other conclusion than they did under the testimony, and for the reasons stated we must affirm the judgment. If the verdict had been for the plaintiff we should have to set it aside for the same reasons. Before dismissing the subject we must say that we are not to be understood as deciding that lands which are situated off from, and do not extend down to the bank of a stream whose banks are the subject of overflow by the ordinary tides, are riparian as to such stream and within the statute of 1856; but we leave the question undecided until there shall be a case necessarily presenting the question. It may also be observed that of course the testimony is too scant to enable us to pass upon the effect, under the riparian act, of the laying out of Washington street, as between the municipality and the plaintiff. Geiger vs. Filor, 6 Fla., 325.

For the reasons stated the judgment must be affirmed, and it will be ordered accordingly.